IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 14-00707 SOM |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING DEFENDANT'S** |
| | ) | **MOTION TO SUPPRESS** |
| vs. | ) | |
| | ) | |
| DOUGLAS FARRAR, SR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

Defendant Douglas Farrar, Sr., says that federal law enforcement agents failed to tell him about his *Miranda* rights before questioning him while he was in custody.  This court, finding him unbelievable, denies his motion to suppress his statements and any fruits of his statements.

I.        **FINDINGS OF FACT.**

Farrar's written motion was little more than an assertion that his rights had been violated.  The moving papers included hardly any facts and no explanation of the nature of any violation.  This court nevertheless held an oral hearing, at which Farrar clarified for the first time that he was challenging the authenticity of a document bearing his signature and stating that he was waiving his *Miranda* rights.  Farrar ultimately provided a highly implausible description of his interview.

On January 19, 2017, this court heard testimony from Homeland Security Investigations Special Agents Todd Nerlin, Terrance Chu, and Reyn Yoshinaga, Farrar's former attorney Victor Bakke, and Farrar himself.  The court received as exhibits a waiver of rights form and a written statement, both signed by Farrar, as well as Agent Nerlin's interview notes.

The court makes the following factual findings, identified by letters of the alphabet for ease of reference in future proceedings.

A.   In May 2013, Homeland Security Investigations agents learned from a confidential informant that Farrar, who lived in Kaneohe, Hawaii, was distributing methamphetamine. Farrar had been convicted in 2007 of state drug charges. Federal agents arranged for the confidential informant to meet with Farrar several times over about a year.

B.   On July 22, 2014, at about 5:00 p.m., federal agents with authorization to arrest Farrar for various federal drug violations executed a search warrant on his house.  Farrar was not at home.

C.   While the agents were searching Farrar's house, Victor Bakke arrived and said that he was an attorney representing "Douglas Farrar."  Bakke, an experienced criminal defense attorney, testified before this court that he received a phone call about a "raid" at Farrar's house.  The caller asked

2

him to represent Farrar and to go over to the house right away
to talk to Farrar.  Bakke drove to Kaneohe, parked a few blocks
from Farrar's house, and walked toward the house.  He was
stopped by two plainclothes law enforcement agents who asked him
what he was doing.

D.   The agents and Bakke have different recollections
of this encounter.  This court does not attribute these
differences to an attempt by Bakke or the agents to mislead this
court.  Rather, these differences appear to this court to spring
from the speed with which events unfolded on July 22, 2014, the
passage of time since that date, and, possibly, confusion in the
minds of one or more of those witnesses between what happened on
July 22, 2014, and what happened after that date.

E.   Bakke's recollection is that he told the agents
that he represented Farrar, and was then questioned about
whether he represented "Jr." or "Sr."  Bakke, who had never met
"Sr.," thought he had been called about "Jr.," but left the
agents to make a phone call to get clarification.  He testified
that he returned to the agents to tell them that he represented
"Sr." and to ask to speak with him.  According to Bakke, very
soon after he told the agents those things, a man Bakke assumed
was Farrar drove up to the house and got out of the car.  The
agents immediately surrounded Farrar and "denied" Bakke any
opportunity to speak with Farrar.  Bakke said he did not want to

3

interfere in an ongoing arrest, so did not call out to Farrar
that he was there to represent him and that Farrar should not
say anything to the agents.  Instead, Bakke returned to his car
and went home.  He did not follow the agents when they drove off
to the HSI field office with Farrar, and he did not seek to be
present at any interview of Farrar.  Bakke later entered an
appearance as Farrar's attorney in court proceedings.  He went
on to represent Farrar in the present case for about ten months
without filing a motion to suppress.  Bakke was succeeded by an
attorney with the Office of the Federal Public Defender, who in
turn was succeeded by present defense counsel.

      F.   Three HSI agents testified about the encounter on
July 22, 2014, with Bakke:  Todd Nerlin, Terrance Chu, and Reyn
Yoshinaga.

      G.   Agent Yoshinaga said he saw a truck drive slowly
past Farrar's house a few times, then stop a few houses away.
Agent Yoshinaga spoke to the driver, who identified himself as
Victor Bakke and said he was Douglas Farrar's attorney.  Agent
Yoshinaga then went to get the case agent, Agent Nerlin, to
speak with Bakke.

      H.   Agent Chu recalled seeing Bakke in the area on
July 22, 2014.  Agent Nerlin remembered coming out from
searching Farrar's house to speak with Bakke.  Agent Nerlin said
that Bakke informed him that he was representing the younger

Farrar.  When Agent Nerlin said the agents were not looking for the younger Farrar, Bakke said, according to Agent Chu, that Bakke could "get ahold of senior for you," to which Agent Chu responded, "Okay."  Agents Nerlin, Chu, and Yoshinaga all testified to thinking that Bakke had left the area before Farrar arrived.  The agents did not recall Bakke's asking to speak with Farrar.

I.    Farrar was alone in his car when he got to the house around 6:00 p.m.  Agent Nerlin testified that he went over to Farrar and asked if he would go with the agents to the HSI field office to answer questions.  According to Agent Nerlin, Farrar agreed and was patted down to ensure that he did not have a weapon.  Farrar was not handcuffed, although Agent Nerlin considered Farrar to be in custody.

J.    Agent Nerlin drove Farrar about 45 minutes to the field office in Honolulu; Agent Chu sat with Farrar in the back for "officer protection."

K.    At the office, Agents Nerlin and Chu took Farrar to an interview room that was approximately nine feet square. The agents sat across a table from Farrar.  Agent Chu testified that the room was appropriately lit and at a comfortable temperature.  Agent Yoshinaga later participated in the interview given Agent Nerlin's occasional trips out of the room to answer phone calls and to perform other investigative tasks.

None of the agents was armed or in the raid or tactical gear they had been wearing at Farrar's house.

L.   The agents and Farrar have vastly different descriptions of the interview.  The court does not attribute these differences to the same kind of innocent confusion the court saw in hearing from Bakke and the agents about the hectic scene at Farrar's house.

M.   Agent Nerlin testified that, before beginning the interview, he read a U.S. Immigration and Customs Enforcement Statement of Rights form to Farrar.  Agent Chu says he was present when Agent Nerlin read the form out loud and presented the typewritten form to Farrar.  Agent Yoshinaga was not present when Agent Nerlin read Farrar his *Miranda* rights.  The form offered by the Government as Government's Exhibit 1 bore the heading "Statement of Rights" and had the following language:

> Before we ask you any questions, it is my duty to advise you of your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court, or other proceedings.
>
> You have the right to consult an attorney before making any statement or answering any questions.
>
> You have the right to have an attorney present with you during questioning.
>
> If you cannot afford an attorney, one will be appointed for you before any questioning if you wish.

6

> If you decide to answer questions now, you still
> have the right to stop the questioning at any
> time, or stop the questioning for the purpose of
> consulting an attorney.

*See* Government's Exhibit 1, ECF No. 86.  Under the heading

"Waiver" on the bottom half of the form, the typed language

read, "I have had the above statement of my rights read and

explained to me and I fully understand these rights.  I waive

them freely and voluntarily, without threat or intimidation and

without any promise of reward or immunity." *Id.*  Under that

language were blank lines for the "time" and "date," which Agent

Nerlin filled in so that they read, "I was taken into custody at

1800 (time), on 7/22/14 (date), and have signed this document at

1847 (time), on 7/22/14." *Id.*

     N.   According to Agent Nerlin, Farrar said that he

understood his rights and was waiving them, and Agent Nerlin

then wrote in the time and date in the waiver section before

Farrar signed in his presence.  Agents Nerlin and Chu testified

that they then also signed and dated the Statement of Rights

form as witnesses.

     O.   Agent Nerlin took the lead in asking questions

during the interview, which was conducted in English and, Agent

Nerlin says, lasted about two and a half hours.  There were

three breaks offered to Farrar to allow him to get water or food

and to use the restroom.  Farrar turned down offers for water or

food but used the restroom a couple of times.  Agents Chu and
Yoshinaga asked occasional questions of Farrar.  All three
agents viewed Farrar as appearing to understand what was
happening and as acting cooperatively and voluntarily.  Agent
Nerlin did not see anything suggesting that Farrar was under the
influence of alcohol or drugs, physically ill, or fatigued.
Agent Nerlin testified that Farrar did not refer to any medical
condition or physical problem and did not tell the agents that
he was on medication at that time.  Agents Nerlin, Chu, and
Yoshinaga testified that Farrar's answers were responsive to the
questions asked.

>        P.    According to the agents, Agent Nerlin typed up a
report summarizing Farrar's interview statements.  Agent Nerlin
used his handwritten notes from the interview in preparing the
typewritten statement, which he titled "Statement of Douglas
Farrar, Sr."  It began:  "I, Douglas Farrar, SR., provide this
statement voluntarily and of my own free will.  I have not been
threatened or coerced by anyone, nor have I been promised
anything in return for providing this statement."  *See*
Government's Exhibit 2, ECF No. 86.  The statement continued:

> I take responsibility for my actions and admit I
> was the one that directed Stephen SHIGEMOTO to go
> to Los Angeles and pick up narcotics and ship the
> narcotics back to Honolulu.  The shipment that
> SHIGEMOTO is sending back to Honolulu contains
> thirty-two pounds of crystal methamphetamine and
> four kilos of cocaine.

> I directed SHIGEMOTO who to meet with and where.
> I contacted these individuals through a cell
> phone that I will provide to law enforcement and
> give law enforcement authorization to search and
> use this phone to further their investigation.
>
> For his role in this shipment, I planned to
> provide SHIGEMOTO with three pounds of crystal
> methamphetamine to sell for profit. This is the
> third time that SHIGEMOTO has flown to Los
> Angeles to meet with these individuals and get
> narcotics. On the last shipment (in
> approximately March 2014 time frame), SHIGEMOTO
> received twenty-five pounds of crystal
> methamphetamine and four kilos of cocaine.
>
> I believe the individuals in Los Angeles are
> Hispanic, but I have never met these individuals.
> I'm not sure the exact amount of money I sent out
> to Los Angeles for this shipment, but believe it
> was over $200,000. I would purchase a pound of
> crystal methamphetamine from these individuals in
> California for approximately $4,800 and I charge
> SHIGEMOTO $16,000 to sell this pound in Hawaii.
> I pay approximately $28,000 for a kilo of cocaine
> in Los Angeles and I'm not sure how much of a
> profit I make here in Hawaii, but estimate it
> would be sold for approximately $50,000.
>
> The only reason that I was selling narcotics was
> to make enough money to purchase my house in
> Kaneohe, HI. As soon as I made enough money to
> purchase the house, I was going to stop selling
> and get out of the business.

*Id.* The last paragraph of the statement said, "I have read this statement and have been given an opportunity to make any corrections therein. This statement is true and accurate to the best of my knowledge." *Id.*

       Q. While Agent Nerlin was preparing the written statement, Farrar was fingerprinted and processed. Agent Nerlin says he then gave the typed statement to Farrar, who silently

read it over for a few minutes, agreed that the written statement was accurate, and signed and dated it.  Agent Chu's recollection matched Agent Nerlin's in this regard.  Agent Nerlin and Agent Chu signed and dated the written statement as witnesses between 10:00 and 10:30 p.m.  *See id.*

　　　　R.　Farrar's description of the interview differs from the agents' description in numerous important respects.  To begin with, Farrar says he was not read his *Miranda* rights before questioning began.  He says his rights were read to him at the end of the interview, after hours of questioning.  Although his signature appears on the waiver of rights form, he says that no preprinted form was presented to him at any time and that what he signed were three entirely blank sheets of paper.  He recalls having done his best to be courteous, respectful, and compliant, and to have signed blank sheets of paper in that spirit.  His understanding was that one signature was for his phone, one for some fireworks that the agents seized, and one for his statement, but he says that in all three instances there no words on the pages when he signed.  This court saw Farrar's signature on only two forms--the waiver of rights form and the statement.  Farrar appeared to be claiming that words were typed in above his signature after the fact.

　　　　S.　Asked about the placement of his signature at the bottom of the waiver of rights form and the statement, Farrar

said he was "pretty sure" that he himself decided where to place his signature on each page.  Notably, his signature on the waiver of rights form is not in the same place as his signature on the statement, although both are on the bottom half of the pages on which they appear.  This court found it highly implausible that someone asked to sign blank pages of paper would consistently sign near the bottom of each page, once toward the left margin and another time toward the right margin. If he signed blank sheets of paper, did Farrar expect words to be inserted above his signature?  This court also found it implausible that agents would type in the waiver of rights language when Farrar was not interviewed in the field and every law enforcement agency has preprinted forms in its office.  Even if, as Farrar contends, he was not read his rights until after the interview, it makes no sense that agents would have unnecessarily bothered to type in the waiver language instead of using the preprinted form.  In short, this court found Farrar's account of signing blank sheets of paper so unbelievable that the court found it hard to credit any part of his testimony. This court expressly finds here that *Miranda* rights were given and voluntarily waived before questioning began.

T.   Farrar also testified that he had taken medication for back pain and anxiety before meeting agents at his house, suggesting that the medication impaired his thinking.

The possibility that he was not thinking clearly, however, is
undercut by what he testified were his repeated invocations of
his Fifth Amendment right against self-incrimination.  He said
that, over the course of hours of questioning, he told the
agents that he had "nothing to say" and was pleading the Fifth
and remaining silent.  He testified that he had had prior
experience with law enforcement and that previously all
questioning had stopped when he said those things.  He said that
this time, by contrast, the questioning continued.  He recalled
that Agent Yoshinaga flipped over a cell phone to show Farrar a
screen with "32" on it.  According to the typewritten statement,
32 was the number of pounds of crystal methamphetamine that
Farrar had directed Stephen Shigemoto to send from Los Angeles
to Honolulu.  Farrar testified that, upon seeing "32," he "broke
down," having been worn out by the lengthy questioning that he
said continued notwithstanding his repeated statements that he
was refusing to talk.

U.   The agents were questioned during the suppression
hearing about whether Farrar had invoked his Fifth Amendment
rights.  Agent Yoshinaga, who was not present for the entire
interview, had nothing to say on that subject, but Agents Nerlin
and Chu testified that Farrar had declined to answer questions
on a single topic.  Agent Nerlin testified that Farrar had
clearly stated that he would answer questions that addressed

12

matters other than that one topic.  Agent Nerlin and Agent Chu
each had handwritten interview notes that included a reference
to Farrar's invocation of the Fifth Amendment, although those
references described the topic in issue differently.  Notably,
those references appear part way into the notes, not at the
start.  The very existence of those references lends credence to
the agents' recollections; had they been deliberately ignoring
Farrar's alleged blanket refusals to talk, they would hardly
have included such references in their notes.  In short, once
again, this court finds Farrar's account unbelievable.  The
court's credibility finding relies heavily on the documentary
evidence.

V.    According to the agents, after Farrar signed the
statement that Agent Nerlin had prepared, Agents Chu and
Yoshinaga asked Farrar how he had learned that his house was
being searched and whether he wanted to turn in any illegal
items.  Farrar told the agents that someone had called him to
tell him that there were law enforcement officers at his house.
According to the agents, Farrar also said he had had some drugs
with him at that time and had stopped on the way home to put
them in some bushes near the Koolau Golf Course, which he agreed
to lead the agents to.

W.    Agent Nerlin, Agent Chu, and another federal
agent took Farrar from the field office to the Koolau Golf

Course in Kaneohe, arriving around 11:15 p.m.  Agent Yoshinaga
followed in a separate car.  The agents found the bag "fairly
quickly" with Farrar's help.  The bag contained two ounces of
crystal methamphetamine, some cash, and a cellphone.  According
to Agent Nerlin, while the agents were taking Farrar from the
golf course to the Federal Detention Center, Farrar gave them
oral consent to search his cell phone and provided the passcode
for it.

III.     **CONCLUSIONS OF LAW.**

      A.     **Farrar Knowingly, Voluntarily, and Intelligently
         Waived His *Miranda* Rights.**

        1.     In *Miranda v. Arizona*, 384 U.S. 436, 444
(1966), the Supreme Court held that a person in custody is
entitled to procedural safeguards before being questioned.  In
the absence of such safeguards, the prosecution may not use what
it learns through its interrogation.  *Id.*  This holding was
premised on the Fifth Amendment's privilege against self-
incrimination, which the Supreme Court reasoned is protected
when a person is adequately and effectively advised of his or
her rights.  *See id.* at 467.

        2.     "An officer's obligation to give a suspect
*Miranda* warnings before interrogation extends only to those
instances where the individual is 'in custody.'"  *United States
v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).  In *Rhode Island v.*

14

*Innis*, 446 U.S. 291, 301 (1980), the Supreme Court defined

"interrogation" to include "any words or actions on the part of

the police (other than those normally attendant to arrest and

custody) that the police should know are reasonably likely to

elicit an incriminating response from the suspect."

3.   *Miranda* warnings must specifically advise a

person in custody that he has a right to remain silent, that

anything he says may be used against him in court, that he has

the right to an attorney before and during questioning, and that

an attorney will be appointed if he cannot afford one.  *See*

*Miranda*, 384 U.S. at 479.

4.   The Ninth Circuit has stated, "In order for

the [*Miranda*] warning[s] to be valid, the combination or the

wording of its warnings cannot be affirmatively misleading.  The

warning[s] must be clear and not susceptible to equivocation."

*United States v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir.

2002) (citation omitted).

5.   A statement made freely and voluntarily

without any compelling influences is admissible.  *Miranda*, 384

U.S. at 478.  If a defendant receives *Miranda* warnings and has

had an opportunity to exercise those rights, he may knowingly

and intelligently waive those rights and agree to answer

questions or make a statement.  *Id.* at 479.  "But unless and

until such warnings and waiver are demonstrated by the

15

prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.*

6.   It is the Government's burden to demonstrate that the defendant's confession and statements were voluntary. *See Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991) (examining whether defendant's confession was coerced); *Lego v. Twomey*, 404 U.S. 477, 489 (1972) ("[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered.").

7.   A statement is considered voluntary if it is the product of rational intellect and free will. *See Blackburn v. Alabama*, 361 U.S. 199, 208 (1960); *Culombe v. Connecticut*, 367 U.S. 568, 583 (1961) (stating that "an extra-judicial confession, if it was to be offered in evidence against a man, must be the product of his own free choice"). To determine whether a defendant's free will was overborne in a particular case, the court must consider the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). In examining the totality of the circumstances, the court must consider both the personal characteristics of the defendant and the details of the interrogation. *Id.* Some characteristics that are considered include the defendant's age, intelligence,

16

educational level, knowledge of rights, and physical, mental, or emotion condition. *Id.* The court will also take into account the length of the defendant's detention, the nature of the questioning, and the use of any physical or psychological punishment. *Id.* After taking these factors into account, the court will evaluate the "legal significance of how the accused reacted." *Id.* No one factor is determinative. *Id.* at 227.

8. Farrar was clearly in custody during his interview. While not handcuffed, he was not free to leave and was going to be asked about his involvement in suspected criminal activities. Although Agent Nerlin said Farrar agreed to go to the field office to answer questions, Farrar was essentially under arrest. Farrar was therefore entitled before the interview began to be warned that he had a right to remain silent, that any statement he made could be used as evidence against him, and that he had a right to an attorney, either retained or appointed.

9. This court has already found that the agents properly administered *Miranda* warnings to Farrar, which he understood, prior to asking him any questions. Agent Nerlin read Farrar *Miranda* warnings from a government agency Statement of Rights form and reviewed each individual line on the form with him in the presence of Agent Chu. The Statement of Rights form presented to Farrar told him that he had a right to remain

silent, that anything he said could be used against him in court or other proceedings, that he had a right to consult an attorney before making any statement or answering any questions, that he had a right to have an attorney present during questioning, and that an attorney would be appointed for him if he could not afford one.  Agent Nerlin also informed Farrar that if he decided to answer questions, he still had a right to stop the questioning at any time or to stop the questioning for the purpose of consulting an attorney.  These specific warnings satisfied *Miranda*.

10.  The Statement of Rights form reflected that Farrar was given his *Miranda* warnings at 6:47 p.m.  He was taken into custody at his house at 6:00 p.m. and then driven from his Kaneohe house to the field office for questioning.  The drive took about 45 minutes.  Thus, the times indicate that Farrar was read his *Miranda* warnings shortly after arriving at the field office.  This court earlier in the order rejected as unbelievable Farrar's contention that he received Miranda warnings only after he was interviewed.

11.  The evidence also establishes that Farrar understood his rights.  According to Agent Nerlin, Farrar orally said that he understood his constitutional rights.  As this court heard for itself, Farrar speaks English well.  The agents testified that he was calm and coherent and did not appear to be

18

ill, on drugs, or on any medication.  Notwithstanding arguments
he made in connection with his suppression motion, there is no
evidence he told any agent that he was on medication or was not
feeling well.  Indeed, Farrar himself testified that he knew he
had certain rights based on his previous experience with law
enforcement.  He stated that he understood that he had a right
to remain silent and agreed that he did not need a lawyer to
explain his rights to him.

> 12.  As noted earlier in this order, after a
defendant is read his rights, he may certainly waive his Fifth
Amendment rights provided the waiver is voluntary, knowing, and
intelligent.  *Miranda*, 384 U.S. at 444, 479.  "An express
statement that the individual is willing to make a statement and
does not want an attorney followed closely by a statement could
constitute a waiver."  *Id.* at 475.  However, a valid waiver will
not be presumed if a defendant is silent after being given
*Miranda* warnings or if a confession is eventually obtained
without a waiver.  *Id.*

> > Presuming waiver from a silent record is
> > impermissible.  The record must show, or there
> > must be an allegation and evidence which show,
> > that an accused was offered counsel but
> > intelligently and understandingly rejected the
> > offer.  Anything less is not waiver.

*Id.* (quoting *Carnley v. Cochran*, 369 U.S. 506, 516 (1962)).

> 13.  Regardless of law enforcement testimony
presented as to the defendant's waiver of rights, "the fact of

19

lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights." *Id.* at 476. Further, "any evidence that the accused was threatened, tricked, or cajoled into a waiver" will demonstrate that the defendant did not voluntarily waive his Fifth Amendment right against self-incrimination. *Id.*

14. In the present case, not only were Miranda rights given before questioning began, Farrar waived those rights voluntarily and knowingly. He indicated that he understood his rights, appeared calm, was offered breaks and food and water, and did not exhibit discomfort. The interview was not unduly lengthy, and there is no evidence of force, coercion, or duress, or of holding Farrar incommunicado. The totality of the circumstances establishes the voluntariness of his waiver.

15. There are, however, two circumstances that warrant more detailed discussion in connection with Farrar's waiver of rights: Bakke's recollection that he told agents at Farrar's house that he represented Farrar, and Farrar's mid-interview invocation of his Fifth Amendment right to be silent. These circumstances are addressed in greater detail below.

**B.   The Agents Did Not Violate Farrar's Rights By Failing to Tell Him Bakke Was His Attorney or By Not Giving Bakke a Chance to Talk to Him.**

1.   With respect to Bakke's recollection that he told agents that he represented Farrar, this court notes that, even accepting Bakke's recollection as correct, the evidence establishes considerable confusion at the house.   Not only was there initial uncertainty about whether "Jr." or "Sr." was involved, there were several agents who spoke with Bakke while the house was being searched, and Farrar himself arrived within minutes.   In the flurry of activity, the agents did not comprehend that Bakke represented Farrar and do not recall Bakke's presence when Farrar arrived home.   This is not a case in which law enforcement agents deliberately or negligently barred counsel from talking to his client.   This court views the agents as having honestly thought that Bakke represented Farrar's son.   Given those circumstances, it would make little sense to exclude Farrar's statement as a sanction for the agents' failure to tell Farrar that his attorney was on the scene or their failure to offer Bakke a chance to talk with Farrar.

2.   *Miranda* warnings were adopted to reduce the risk of a coerced confession and to implement a suspect's right against self-incrimination under the Fifth Amendment.   *See Dickerson v. United States*, 530 U.S. 428, 435, 442 (2000);

*Miranda*, 384 U.S. at 467.  *Miranda* warnings are "not themselves rights protected by the Constitution but are instead measures to insure that the suspect's right against compulsory self-incrimination is protected."  *Moran v. Burbine*, 475 U.S. 412, 424 (1986) (brackets omitted) (quoting *New York v. Quarles*, 467 U.S. 649, 654 (1984)).  The purpose of *Miranda* warnings "is not to mold police conduct for its own sake" but to "dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgement of the suspect's Fifth Amendment rights."  *Id.* at 425.  Thus, *Miranda* requires the exclusion of a suspect's unwarned statements at trial, which is a "complete and sufficient remedy" for a perceived violation of a suspect's rights.  *Chavez v. Martinez*, 538 U.S. 760, 790 (2003).  That is, the suppression of a suspect's unwarned statements serves to deter law enforcement officers from failing to give a suspect his *Miranda* warnings and from actually violating a suspect's Fifth Amendment rights.  *See United States v. Patane*, 542 U.S. 630, 641–42 (2004) (discussing deterrent effects on law enforcement as justifying exclusionary rule in various contexts).  Excluding Farrar's statements because of confusion during the encounter between the agents and Bakke would not materially advance *Miranda*'s objectives.

         3.    The Supreme Court has provided clear directives applicable here.  In *Moran v. Burbine,* the Court

declined to read *Miranda* as requiring that law enforcement
agents inform a suspect that an attorney has been arranged for
him by his family.  475 U.S. at 427.  Brian Burbine was given
his *Miranda* rights, signed waivers of those rights, and was
questioned about a murder.  *Id.* at 415-16.  While Burbine was
detained for questioning, his sister, unaware that he was being
questioned about a murder, called the local Public Defender's
Office to arrange for an attorney to represent Burbine in
connection with an unrelated burglary.  *Id.* at 416-17.  An
Assistant Public Defender called the police station, said she
was Burbine's attorney and wanted to be present for a lineup or
questioning, and was told that the police would not be
questioning Burbine or putting him in a lineup and in fact were
through with him for the night.  *Id.* at 417.  No one told the
attorney that Burbine was actually being questioned at that very
time about a murder, and no one told Burbine that an attorney
had been arranged for him by his sister.  *Id.* at 417-18.  He
confessed to the murder.  *Id.* at 418.  He later moved
unsuccessfully to suppress his statements and was convicted
after a jury trial.  *Id.*  Burbine appealed.  *Id.*  The Supreme
Court of Rhode Island affirmed.  *Id.*  He then sought federal
habeas relief.  *Id.* at 419.  The Fifth Circuit granted relief,
but the Supreme Court reversed.  *Id.* at 419-20.

    4.    The Court said in *Moran*:

23

> Because, as *Miranda* holds, full comprehension of
> the rights to remain silent and request an
> attorney are sufficient to dispel whatever
> coercion is inherent in the interrogation
> process, a rule requiring the police to inform
> the suspect of an attorney's efforts to contact
> him would contribute to the protection of the
> Fifth Amendment privilege only incidentally, if
> at all.  This minimal benefit, however, would
> come at a substantial cost to society's
> legitimate interest in securing admissions of
> guilt. . . .  Because neither the letter nor
> purposes of *Miranda* require this additional
> handicap on otherwise permissible investigatory
> efforts, we are unwilling to expand the *Miranda*
> rules to require the police to keep the suspect
> abreast of the status of his legal
> representation.

*Id*. at 427.

5.   Bakke himself did not seem to think agents had to identify him to Farrar, as Bakke did not call out to Farrar that he was there as his attorney.  Although Bakke testified he told agents before Farrar arrived that he wanted to talk to Farrar, Bakke made no such request once Farrar arrived, instead appearing to accept the lack of opportunity to have any contact with Farrar.  Nor did Bakke follow Farrar to the field office, or thereafter seek to suppress Farrar's statement.

6.   Notably, Farrar himself testified that he understood very well that he had a right to be silent, which is the only advice Bakke said he would have given Farrar had he spoken with him before the interview.  Farrar presents no authority for the proposition that a statement should be

24

suppressed if agents who do not think an arrestee has an attorney fail to tell an arrestee that he does indeed have an attorney.  Even if one could conceive of situations in which a court might suppress evidence based on a failure to tell a defendant about his or her attorney, in this case it is enough for Fifth Amendment purposes that Agent Nerlin told Farrar that he had a right to an attorney and that one would be appointed for him if he could not afford one.

7.   Farrar's memorandum in support of his motion to suppress does not mention the Sixth Amendment right to counsel, but near the end of the suppression hearing, Farrar's counsel argued that Farrar's Sixth Amendment rights had been violated when Bakke was denied access to him at the time he was detained at his house.  Although this was not an argument the court (or, presumably, the Government) had notice before the suppression hearing that Farrar would raise, this court concludes that no Sixth Amendment violation occurred.

8.   The Sixth Amendment of the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  A defendant's right to counsel attaches in a criminal prosecution after adversarial judicial proceedings have begun.  *See Rothgery v. Gillespie Cty.*, 554 U.S. 191, 213 (2008); *see also Kirby v.*

25

*Illinois*, 406 U.S. 682, 688 (1972) (noting "right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against" defendant).   That is, a defendant's Sixth Amendment right to counsel "applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty."   *Rothgery*, 554 U.S. at 194.   *See also United States v. Charley*, 396 F.3d 1074, 1082 (9th Cir. 2005) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)); *United States v. Hayes*, 231 F.3d 663, 675 (9th Cir. 2000) (affirming that "the Supreme Court, this court, and every other circuit to consider a similar issue" has applied this "clean and clear rule" and noting that the Ninth Circuit is "loath to engraft some new, pre-indictment proceeding onto the rule").

         9.   The Supreme Court has characterized an "adversarial judicial proceeding" as one in which "the accused is confronted, just as at trial, by the procedural system, or by his expert adversary, or by both in a situation where the results of the confrontation might well settle the accused's fate and reduce the trial itself to a mere formality."   *United States v. Gouveia*, 467 U.S. 180, 189 (1984) (quotations and citations omitted).   The Sixth Amendment right to counsel thus attaches in the "'critical' stages in the criminal justice process" when the government commits to prosecuting its case.

*Maine v. Moulton*, 474 U.S. 159, 170 (1985); *see Charley*, 396 F.3d at 1082.

10.   In *Anderson v. Alameida*, 397 F.3d 1175, 1180 (9th Cir. 2005), the Ninth Circuit stated that, because "a police inspector filing a complaint seeking an arrest warrant is not a critical stage that commits the prosecutor to trial," no right to counsel attaches at arrest or at an extradition hearing.   Similarly, in *United States v. Pace*, 833 F.2d 1307, 1312 (9th Cir. 1987), the Ninth Circuit held that the defendant's Sixth Amendment right to counsel "did not attach upon the filing of the complaint by the FBI, the issuance of the warrant of arrest, or [the defendant's] arrest."

11.   In addressing Farrar's Sixth Amendment argument, this court is aided by the Supreme Court's discussion in *Moran*, discussed earlier in connection with Farrar's Fifth Amendment rights under *Miranda*.   The defendant in *Moran* sought to exclude incriminating statements made to the police after his family had retained an attorney but before the government brought formal charges against him.   *Id.* at 416-18.   The Supreme Court made it clear that "the possibility that the encounter may have important consequences at trial, standing alone, is insufficient to trigger the Sixth Amendment right to counsel."   *Id.* at 432.   The Supreme Court observed, "As a practical matter, it makes little sense to say that the Sixth Amendment right to

27

counsel attaches at different times depending on the fortuity of whether the suspect of his family happens to have retained counsel prior to interrogation." *Id.* at 430.  Noting that the existence of an attorney-client relationship did not by itself trigger the protections of the Sixth Amendment, the Court observed, "The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor." *Id.*  The Supreme Court reiterated that the Sixth Amendment right to counsel "becomes applicable only when the government's role shifts from investigation to accusation." *Id.*

        12.  Farrar's Sixth Amendment right to counsel did not attach at the time he was taken into custody because adversarial judicial proceedings had not yet commenced.  When Farrar was taken into custody, federal agents were still in the process of conducting their ongoing investigation.  At the time Farrar was interviewed, the first formal charging proceeding had not occurred.  No preliminary hearing or arraignment had occurred, and no indictment had been issued.  The agents were simply executing a federal search warrant and detaining Farrar for questioning as part of their ongoing investigation.  Because this cannot be said to have been a "critical stage" of the

prosecution, Farrar's Sixth Amendment right to counsel had not yet attached.

13.   Although Farrar's attorney had been retained by his family and had showed up at the scene, the mere existence of a possible attorney-client relationship did not entitle Farrar to the protections of the Sixth Amendment.  Additionally, the federal agents had no obligation under the Sixth Amendment to inform Farrar once he had been taken into custody that his attorney had been at his house and had wanted to speak with him. Because Farrar's right to counsel had not yet attached at the time his attorney was allegedly denied access to speak with him, there cannot have been a violation of the Sixth Amendment.

### C.   Farrar's Mid-Interview Invocation of the Fifth Amendment Was a Limitation on His Waiver, Not Total Withdrawal of His Waiver.

1.   The court turns to the issue of Farrar's mid-interview invocation of the Fifth Amendment.  As noted earlier in this order, this court has ruled that Farrar was read his *Miranda* rights before questioning began and voluntarily waived those rights.  All of the credible evidence points to his understanding of those rights and valid and voluntary waiver of them.  Far from exhibiting any confusion about his rights, he displayed comprehension of them.  He said nothing about being impaired by any physical or psychological condition or medication and gave no sign of impairment.  He then proceeded to

respond to questions and appeared cooperative and engaged.  He was offered breaks, food, and water.

2.    At the suppression hearing, Farrar said that, during his interview, he had repeatedly invoked his right to remain silent over a period of several hours by telling the agents that he had "nothing to say" and was "pleading the Fifth."  At the hearing, Farrar contended that the agents failed to respect his right to remain silent.  Earlier in this order, this court found this assertion unbelievable.

3.    However, a defendant may rescind a waiver of the right to be silent, even after questioning has begun.  In that event, questioning must stop.  *Miranda*, 384 U.S. at 474.  By the same token, if a defendant states, at any stage of the process and in any manner, that he wants an attorney, the interrogation must end until an attorney is present.  *Id.* at 444-45; *see also Edwards v. Arizona*, 451 U.S. 484, 484-85 (1981) (holding that defendant may not be subject to further questioning by law enforcement until an attorney has been made available to defendant, unless defendant himself initiates further communication, exchanges, or conversations with law enforcement).

4.    A suspect may rely on his right to remain silent selectively.  "The mere fact that [a defendant] may have answered some questions or volunteered some statements on his

30

own does not deprive him of the right to refrain from answering
any further inquiries until he has consulted with an attorney
and thereafter consents to be questioned." *Miranda*, 384 U.S. at
445; *see also Hurd v. Terhune*, 619 F.3d 1080, 1085 (9th Cir.
2010).  "A suspect may remain selectively silent by answering
some questions and then refusing to answer others without taking
the risk that his silence may be used against him at trial."
*Hurd*, 619 F.3d at 1087.

        5.   Based on the credible testimony of the
agents, this court concludes that Farrar invoked his right to be
silent and refused to answer selected questions, but he waived
the right to be silent and chose to answer other questions.
First, having first waived his right to be silent, Farrar did
not then unambiguously rescind that waiver or invoke his right
to remain silent as to all questions.  In fact, he expressly
agreed to answer other questions, and indeed responded to those
other questions.  As Agent Nerlin and Agent Chu testified,
Farrar invoked his right to remain silent with respect to
questions relating to either money laundering or drag racing.
(Those topics may have been related.)  The agents indicated that
they did not further pursue those subjects, meaning that they
honored Farrar's right to remain silent on the matters he chose
not to address.

6.    Also, as this court noted earlier, the agents' notes lend credence to their testimony by including notations of Farrar's invocation mid-interview of his Fifth Amendment rights.  If the agents had thought Farrar was unambiguously invoking his right to remain silent and did not want to answer any of their questions, and if the agents had resolved to ignore his invocation of his Fifth Amendment rights, then they would hardly have memorialized that clear constitutional violation by referring to the Fifth Amendment invocation.

7.    "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afforded." *Berghuis v. Thompkins*, 560 U.S. 380, 385 (2010).  The evidence indicates that Farrar refused to answer certain questions relating to money laundering or drag racing in the middle of the interview, but continued to be willing to answer other questions.  Agent Nerlin testified that Farrar explicitly agreed to answer other questions after refusing to answer questions relating to money laundering.  Because there is no question that Farrar understood his rights and knew how to invoke his right to remain silent, his continued responses

reflect a deliberate choice on his end to waive his right to remain silent.

       8.   This court concludes that Farrar selectively exercised his Fifth Amendment right to be silent.  With respect to the matters he did discuss, Farrar waived that right.  The agents honored Farrar's invocation of his right to remain silent as to certain questions and continued questioning on other topics only after Farrar expressly agreed to answer questions on those other topics.

**IV.**       **CONCLUSION.**

       The motion to suppress is denied.

       IT IS SO ORDERED.

       DATED: Honolulu, Hawaii, February 24, 2017.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

United States v. Douglas Farrar, Sr., Crim. No. 14-00707 SOM; ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS.