IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 14-00707-SOM-1 |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT |
| | ) | DOUGLAS FARRAR, SR.'S MOTION |
| | ) | FOR COMPASSIONATE RELEASE |
| | ) | |
| vs. | ) | |
| | ) | |
| DOUGLAS FARRAR, SR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANT DOUGLAS FARRAR SR.'S
MOTION FOR COMPASSIONATE RELEASE**

**I.      INTRODUCTION.**

In 2018, a jury found Defendant Douglas Farrar Sr. guilty of several counts involving the distribution of large quantities of cocaine and methamphetamine.  This court sentenced him to 324 months in prison.  Farrar has served approximately six years of that sentence, and his projected release date is July 24, 2037.  He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Farrar's request is based on the COVID-19 pandemic.  He contends that his underlying medical conditions (diabetes, obesity, sleep apnea, high cholesterol, and kidney failure) make him vulnerable to complications if he contracts COVID-19. Farrar, who recently turned 57, is housed at FCI Terminal Island, which, on April 30, 2020, reported that Farrar had tested positive for COVID-19.  The medical records do not report that he

exhibited serious complications.  ECF No. 228.  Now, several months later, it is difficult for this court to conclude that Farrar is likely to suffer such complications.  It is equally difficult for this court to determine whether he might be reinfected or might now have some form of immunity from the virus.  These circumstances, coupled with Farrar's concerning record (including a history of selling large quantities of drugs and involving his son in his criminal behavior) and the significant time remaining on Farrar's sentence lead this court to conclude that, at least at this point, Farrar has not established extraordinary and compelling reasons that warrant a reduction in his sentence.

**II.     ANALYSIS.**

Farrar's compassionate release request is governed by 18 U.S.C. § 3582(c)(1)(A), which provides:

> [T]he court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . .

2

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

In other words, for the court to exercise its authority under § 3582(c)(1)(A), it must (1) find that the defendant exhausted his administrative remedies or that 30 days have passed since he filed an administrative compassionate relief request; (2) also find, after considering the factors set forth in section 3553(a), that extraordinary and compelling reasons warrant a sentence reduction; and (3) find that such a reduction is consistent with the Sentencing Commission's policy statements. *United States v. Scher*, 2020 WL 3086234, at *2 (D. Haw. June 10, 2020).

### A. Farrar has satisfied the time-lapse requirement of 18 U.S.C. § 3582(c)(1)(A).

Farrar submitted an administrative compassionate release request to the warden of his prison more than 30 days before filing this motion. *See* ECF No. 225, PageID # 2481. He has satisfied the time-lapse requirement of 18 U.S.C. § 3582(c)(1)(A). The Government is not contesting Farrar's satisfaction of the exhaustion requirement. *Id.*

### B. Farrar has not demonstrated that extraordinary and compelling circumstances justify his early release.

This court therefore turns to § 3582(c)(1)(A)'s second requirement: whether extraordinary and compelling reasons warrant a sentence reduction. In orders addressing compassionate release

motions in other cases, this court has expressly recognized that it possesses considerable discretion in determining whether a particular defendant has established the existence of extraordinary and compelling reasons that justify early release. This court has also stated that, in reading § 3582(c)(1)(A) as providing for considerable judicial discretion, the court is well aware of the absence of an amended policy statement from the Sentencing Commission reflecting the discretion now given to courts under that statute. *See United States v. Scher*, 2020 WL 3086234, at *2 (D. Haw. June 10, 2020); *United States v. Cisneros*, 2020 WL 3065103, at *2 (D. Haw. Jun. 9, 2020); *United States v. Kamaka*, 2020 WL 2820139, at *3 (D. Haw. May 29, 2020).

The CDC currently lists the following conditions as creating an increased risk of a severe illness from COVID-19:

*Cancer

*Chronic kidney disease

*COPD (chronic obstructive pulmonary disease)

*Immunocompromised state (weakened immune system) from solid organ transplant

*Obesity (body mass index [BMI] of 30 or higher)

*Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies

*Sickle cell disease

*Type 2 diabetes mellitus

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/

people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited August 28, 2020).

The CDC also lists the following as possibly increasing the risk of a severe illness from COVID-19:

> *Asthma (moderate-to-severe)
>
> *Cerebrovascular disease (affects blood vessels and blood supply to the brain)
>
> *Cystic fibrosis
>
> *Hypertension or high blood pressure
>
> *Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines
>
> *Neurologic conditions, such as dementia
>
> *Liver disease
>
> *Pregnancy
>
> *Pulmonary fibrosis (having damaged or scarred lung tissues)
>
> *Smoking
>
> *Thalassemia (a type of blood disorder)
>
> *Type 1 diabetes mellitus

*Id.*

Under the CDC's guidance, Farrar's obesity and diabetes place him at risk of a severe illness if he contracts COVID-19. Farrar is housed at FCI Terminal Island. Early in the COVID-19 pandemic, the virus spread rapidly through the prison. Because

the parties offered conflicting accounts of the prison's present conditions, this court deferred ruling on this motion until it could review an expert report by Dr. Michael Rowe summarizing the current state of the outbreak at Terminal Island in *Wilson v. Ponce*, No. CV. 20-4451 (C.D. Cal.). Dr. Rowe filed that report on August 24, 2020.

Two of Dr. Rowe's conclusions are particularly important. On the one hand, Dr. Rowe determined that "there is almost no active virus in the institution[.]" ECF No. 241, PageID #2729. Only two inmates still have COVID-19, and they are in quarantine. *Id.* Of those two inmates, one "is probably not even infectious, and the other will likely have met release criteria by the date of submission of this report." *Id.* But "the possibility for a devastating return of the outbreak remains." *Id.* Even though FCI Terminal Island has "instituted many appropriate practices, and, overall, is complying with the most current CDC recommendations for correctional facilities," all prisons face unique challenges in responding to the coronavirus. *Id.* "Correctional institutions are, intrinsically, not designed to provide adequate social distancing." *Id.* at 2722. The risks of a second outbreak are further heightened because prison officials are not in total compliance with measures designed to prevent COVID-19 from re-entering the prison or once again spreading. *Id.* at 2761-83.

In sum, while Farrar might not be in immediate danger of being re-infected, the possibility that he will be exposed to the virus again in the future cannot be ignored. Under those circumstances, Farrar's susceptibility to COVID-19, standing alone, is not an exceptional and compelling reason that warrants a reduction in sentence. This court must examine the other relevant considerations before reaching a conclusion about how to rule.

One factor this court must consider is Farrar's previous exposure to COVID-19. Farrar was tested for COVID-19 on April 23, 2020, and the test came back positive on April 30, 2020. ECF No. 228, PageID # 2527-29. That raises two issues. First, the medical records do not indicate that Farrar suffered serious complications. There is no way for this court to know whether Farrar's test was a false positive, but, if the test was accurate, it appears that Farrar may have survived the virus without exhibiting any of the worst symptoms associated with COVID-19.

Second, Farrar may have some immunity against future infection. Individuals infected by certain other viruses have at least some immunity, although the strength and length of that immunity may vary. This court is acutely aware that no one completely understands how the coronavirus operates. Evidence suggests that COVID-19 antibodies decline over time. Some

experts, however, have indicated that individuals infected with COVID-19 are likely to remain immune even after their antibody count drops. As one article put it, "[a] decline in antibodies is normal after a few weeks, and people are protected from the coronavirus in other ways." Apoorva Mandavilli, *Can You Get COVID-19 Again? It's Very Unlikely, Experts Say*, N.Y. Times, July 22, 2020, https://www.nytimes.com/2020/07/22/health/covid-antibodies-herd-immunity.html; *see also* Martin Finucane, *Here's What You Need To Know About Fading Coronavirus Antibodies*, Boston Globe, July 23, 2020, https://www.bostonglobe.com/2020/07/23/nation/heres-what-you-need-know-about-fading-coronavirus-antibodies/; Derek Thompson, *How Long Does COVID-19 Immunity Last?,* The Atlantic, July 20, 2020, https://www.theatlantic.com/ideas/archive/2020/07/could-covid-19-immunity-really-disappear-months/614377/. Even after COVID-19 antibodies decline, the body might retain immunological memory that allows it to quickly produce new antibodies to respond to a second infection. *See* Finucane. Some experts therefore posit that, at the very least, it is highly unlikely that individuals will contract the coronavirus twice. *See id*.

More recently, researchers reported that "[a] Hong Kong man who was initially infected with the coronavirus in March and made a full recovery was reinfected more than four months later after a trip abroad." Adam Taylor and Ariana Eunjung Cha, *First*

*Coronavirus Reinfection Documented in Hong Kong, Researchers Say*, August 24, 2020, https://www.washingtonpost.com/health/2020/08/24/coronavirus-reinfection-hong-kong/. But even that finding is equivocal, as "some immunologists emphasized the case was not a surprise," and, because the patient had no symptoms the second time, those immunologists called the case "a textbook example of how immunity should work." *Id.* In light of the scientific uncertainty, this court is in no position to make a definitive determination about immunity, but the combination of Farrar's lack of complications after testing positive and the possibility of some form of immunity cannot be ignored in any evaluation of whether there are extraordinary and compelling reasons warranting a reduction in his sentence.

The court has additional concerns about releasing Farrar early. Farrar has only served about 20% of his sentence. Even after credit for good behavior is taken into account, Farrar still has more than 17 years left to serve. Releasing Farrar now would not reflect the seriousness of Farrar's offense, promote respect for the law, provide just punishment for the offense, or afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a).

The record also suggests that Farrar might pose a danger to the community if released. In 2007, a state court convicted Farrar of cultivating a large quantity of marijuana for

9

sale. ECF No. 166, PageID # 1057. He was released on parole in 2012, and, only two years later, he was arrested for the conduct at issue in this case, namely, selling large quantities of methamphetamine and cocaine. In addition, he involved his son in both schemes and has never taken responsibility for his conduct. In short, his record is not encouraging.

Farrar clearly has serous medical conditions to which this court gives serious consideration. The court can imagine granting compassionate release to another defendant of his age with those same serious conditions but without the other concerning factors that Farrar presents. Under § 3582(c)(1)(A), only extraordinary and compelling circumstances can justify a reduction in an inmate's sentence. In deciding whether a reduced sentence is warranted, this court has balanced the seriousness of Farrar's crime, the amount of time remaining on his sentence, his criminal history and the potential for recidivism, his inclusion of his adult son in his criminal activity, the totality of the medical information he has submitted (including his earlier positive test), his age, and the conditions at his facility. This is not an easy decision, and the court understands why Farrar has brought his motion and why his attorney has so thoroughly advocated on his behalf. But, when all relevant circumstances are considered, this court determines that the reasons raised by Farrar, while important, do not rise to the

level of being extraordinary and compelling reasons warranting a reduction in his sentence.

**III.    CONCLUSION.**

Farrar's request for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is denied.

It is so ordered.

DATED: Honolulu, Hawaii, August 28, 2020.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*United States v. Farrar*, Cr. No. 14-00707-SOM-1; ORDER DENYING DEFENDANT DOUGLAS FARRAR, SR.'S MOTION FOR COMPASSIONATE RELEASE